Lang and Camacho Contreras. I don't know how you all have divided up the time on this, perhaps you'll let the court know and we'll proceed accordingly. Thank you, Your Honor. My name is Terrence Kellogg. I represent Ruben Camacho Contreras. Ms. Stamm, Mr. Black on behalf of Mr. Lamb, and with no objection from Mr. Rogoff on behalf of the government, we ask the court to accept 10 minutes initial argument from me on behalf of both Mr. Yim and Mr. Camacho Contreras, followed by 5 minutes of argument by Mr. Black on behalf of Mr. Lamb, rebuttal by the government, and the remaining 5 minutes of our 20 minutes by Ms. Stamm, rebuttal as to the wiretap issues common to both Mr. Yim and Mr. Camacho. Objection. Just keep track of your time if you will, counsel. Thank you. Please proceed. Thank you, Your Honor. The standard of review we submit is of critical importance in this case in two regards. Initially, there's confusion, and perhaps it's only in my mind, but it stems from the Lynch case as to what the appropriate standard of review is in the appeal of 18 United States Code 2518, subsection 3C, where the court has authorized a wiretap application. Help me with something on this. I get it in my head and it leaves. I have difficulty figuring out what, if any place, Leon has in these wiretapping search warrant cases. Your Honor, I think that it has no place. I think that that's one of the arguments that the government makes is that this was in good faith, these officers are entitled to the good faith, and Where is my authority that says Leon has no applicability? Well, Your Honor, I think that it comes from how Leon is limited to search warrants and the suppression of police misconduct cases when there's been affirmative misrepresentations. This is a creature of statute, not There's no suppression because the idea of suppression is to deter improper police conduct that has not been reviewed by a magistrate prior to execution of a warrant. I misspoke myself. You're perfectly correct, and that was the point that I was trying to make. Leon is a judicial rule. Here we're talking about a statutory rule that has to be strictly construed, strictly applied, and either is complied with or not. So we submit that Leon has no bearing on wiretap challenges. Surely there's a case that holds whether it has no bearing or bears on only part of the analysis. If there is, I have not found it, Your Honor. I have not specifically researched that issue because I'm puzzled by it every time I got one of these wiretapping cases. That's why I ask you. Well, I think that this is our opportunity to make good and correct law, which is that Leon does not apply to wiretap cases because a wiretap is a statutory creature, a statutory enactment. And it's not a question of good faith as much as it is whether or not the unique and compelling statutorily created authorization for a wiretap has been met under. Basically, under the statute, in order to get a wiretap warrant, they have to show that ordinary investigative techniques that are not as intrusive on third parties especially as wiretapping either have been tried unsuccessfully or could not be tried without excessive danger. The trap is if the police say, we know they're dirty but we have no evidence of it and we need a wiretap to go get some, that's a perversion of the statute. That can't be enough. That's how I understand the scheme. Is that correct? Well, Your Honor, I agree with Your Honor's statement as to the scheme with a couple of nuances that may not make a difference. There's actually three exceptions. One is that they would be futile if tried as well as the third one being too dangerous. And the first one is that they have been tried. Yes, I agree. Now, in this case, it looked like some had been tried. I think it was Yim, I get the names mixed up, quit talking to their best shot at an undercover and he couldn't connect up anymore with the group. Well, Your Honor, I think that there's some confusion because the government's position is this was a five-month investigation starting off in Phoenix. Not really. It had gone, well, I think there was some out of D.C. and some out of Phoenix and then some out of Seattle. Right. Our position has always been it was a five-week investigation once it was referred to Seattle. There were two C.I.'s, confidential informants, in Phoenix that provided information about Yim and Nima when they first came on the radar in Phoenix, but this was basically a Seattle investigation. We're not saying that there was absolutely nothing that was done by way of traditional law enforcement techniques, but when Seattle DEA started investigating this case, they did minimal effort. And, in fact, their application, just like the government's argument now, wants to join all of the Phoenix investigation as part of what law enforcement did here when actually... Why isn't it enough that they say they tried and they observed that the defendants in this case were so careful about surveillance and counter-surveillance that they really couldn't do anymore without tipping them off? Well, Your Honor, I think that earlier cases like Blackman and others specifically talk about the inherent difficulties as opposed to the particular instance here, and that is what law enforcement in these affidavits, and there were numerous affidavits, we're talking about 14 months here, we're talking about 55 target telephones, 69 suspects, and 19 defendants indicted. What law enforcement has done here is they have said, well, it's too dangerous to our investigation to utilize traditional law enforcement techniques such as surveillance or use of... I thought that went to futility and the dangerousness went to whether an attempted undercover would get killed. Well, and that's my point, is that law enforcement was saying that it was a danger to the investigation. And I appreciate your comment that it goes to futility and not to actual dangerousness, but they didn't even try. There was nothing done that could easily have been done before there was an initial application for wiretap. What should have been done? Well, for instance, when they followed Mr. Yim to Los Angeles before the wiretap application, they observed him meeting with an individual that proved to be Mr. Ayala not only on Los Angeles wiretaps but was also a suspect in the previous, in this district, Yihong Su case, which involved Yemenima suspects, Camacho, Hawk, and numerous other individuals as actual defendants in that case, as well as many of the same sources of supply. That's one thing that easily could have been done. What could have been done? They could have checked public records, determined the license registration of the vehicle that was in Los Angeles was operated by Mr. Hawk, who had been successfully prosecuted by DEA investigation in the Yihong Su case. They had a lead, Christine Vanderwerf, who had been stopped in an automobile in New Jersey. That car had been rented by Mr. Yima. Counsel, I wonder if I could interdict this a little bit. I thought you were going to talk about the standard of review. I had. You've gotten off on a lengthy recitation of what they could have done, but in reality the district court made a ruling here. Well. And how are we to view that ruling? The district court considered all these things and made a ruling. How are we to review that? Well, two things, Your Honor. First off, Judge Peckman, in her order, said her standard of review is deferential to the issuing magistrate. And, in fact, she said at one point in the transcript, you know what you're asking me to do. We have two Title III judges here. I submit that the standard of review for Judge Peckman. The magistrate judge is not an Article III judge. Well, she was talking about Title III, the wiretap judge. Oh, Title III, okay. Yeah, I'm sorry. I said Article III. I meant Title III. A little nervous. I've done this before, but I'm still a little nervous. We submit that it's de novo review under Lynch as to that second subset that we're talking about, C-3 of 2518, as to whether or not. On what basis? That's an amazing claim. So you're basically saying that the factual determination made by Judge Peckman, in reliance to some degree on what the magistrate judge did, it's just out the window. You want us as a court of appeal to review the determination of whether the factual statement or consideration of the investigation, you want us as a court of appeal to make that determination de novo. Is that right? Well, Your Honor, no, because I agree that the cases are consistent, that as to the facts, this court reviews them for a deferential standard. Which is abuse of discretion, right? Right, abuse of discretion, clear error for findings of fact. But then Lynch talks about as to whether or not under this subsection 3C, in addition to the 1C, full and complete disclosure in the applications, are reviewed de novo. The only reason I butt in just a little bit on my teeth here is that Ventresca says, when a magistrate's found probable cause, courts should not invalidate the warrant by interpreting the affidavit in a hyper-technical rather than a common sense manner. So it seems to me, and I'm just trying to have you again, because I feel like that the good presiding judge here is right on point, if I cannot even, once the magistrate has found probable cause, interpret the affidavit in a hyper-technical manner, then at that point it seems to me that even in reviewing the affidavit, I have to be a little less, if you will, observant of what really should be there and what should not. I can't get hyper-technical in my review. And the cases support your position that as far as the... Not my position, it's Ventresca's, which is my court's position, so I guess it has to be mine. Well, but they say that the finding of probable cause is entitled to a deferential standard. Findings of fact are entitled to a deferential standard. The legal conclusion that obtains from those facts as found are what this court is entitled to review de novo, what Judge Peckman should have applied to de novo review. But, counsel, with respect, you know, de novo review suggests that we just ignore what happened before, and we look at it de novo, newly. If it's purely legal, that's one thing. But here, if I understand your position correctly, you're asking us to take these affidavits, which I guess are 56 pages long or something like that, review it all together, and make a de novo determination of whether this is sufficient. Doesn't that just completely override the case law as to the deference we're supposed to give to the district judge or, for that matter, the magistrate judge? Your Honor, I would submit that it's mixed questions of law and fact. The facts are entitled to a deferential review. The legal effect under the statute is a matter of law, and that is what's subject to de novo review. So if they apply the law, sorry. So if they apply the law, if all they're doing is trying to decide the facts and they've applied the right law, we're done. I mean, the magistrate's decision is about necessity. The magistrate's decision is entitled to, as I understand it, an abuse of discretion. So as long as the magistrate applies the correct law to the facts the magistrate finds, I'm having a tough time seeing why that's an abuse. Because the law has to be applied correctly, and the magistrate's decision is not entitled to abuse of discretion standards. Those search warrants. I'm not sure of that, and let me tell you why not. Thank you. I know this is a very complex thing, and any of us may have it wrong, but I look at United States v. Garcia-Villalba. Yes, sir. As focusing pretty heavily on standard of review, and it says, first we must review de novo whether the application was submitted in compliance with the statute. Then we must review the issue in court's decision that the wiretaps were necessary for an abuse of discretion. And then it goes on a little later in the decision to say, our precedent requires us to decide whether the magistrate judge clearly erred in finding probable cause, and it says that given the deference that we and the district court owe to the magistrate judge who issued the warrant, the district court erred in that case in saying that the warrant did not, was not supported by probable cause. The way I put that together is that the magistrate judge does get abuse of discretion review all the way up, provided that the application was submitted in compliance with the statute. What am I misreading? I think that we're talking about the difference between subsection one, the full and complete disclosure, which is clearly everybody agrees de novo review, and subsection two as to whether or not that authorizes the application. And I think that you've got to make a complete disclosure. Absolutely. And that's de novo. Right. But as for whether that's enough, both for probable cause to believe that you'll find evidence of a crime, and for compliance with the requirement that other investigative techniques were tried and didn't work or couldn't be tried without excessive danger and so forth. Well, I want to answer the judge's question, but your side has four minutes and 11 seconds left, and none of your other colleagues have said anything. Your Honor, I appreciate that you were on the en banc reconsideration of Lynch. I think that that's Lynch four. That language is confusing. The wording is exactly the same as Lynch three, which I cited in my brief. The government cited Lynch four. We would appreciate clarification. Thank you very much. Okay. Now, how are you going to work this? Okay, so hear from him and your counsel for rebuttal. What's she going to get? As much time as you give her. I wouldn't bet a whole lot on that, counsel. You all divide it however you wish. The problem with dividing it among three is it's very difficult, as we've seen this morning. Mr. Black, I don't know, he'll speak for himself. Okay, whatever you want to do, just understand with no offense intended to my learned counsel there in the middle, we've got to follow the rules here, basically. So whatever you decide you're going to do, that's fine. But we'll maybe give you a little extra time, but don't count a whole lot. Go ahead. Thank you. Good morning, Your Honors. May it please the Court, my name is Christopher Black. I represent Hong Lam, whose case came out of the same district court case but has a very different issue on appeal. Given the time constraints here and the limited nature of the issue in Mr. Lam's case, what I would like to do is ask the Court if the Court has any questions regarding any of the arguments in the briefs. It's my understanding you don't dispute the guideline computation, right? That's correct, Your Honor. Your argument is, as I understand it, that the Court did not appreciate for policy purposes that it could depart from the guideline computation. Is that what you suggested? That is correct, Your Honor. And yet it did depart from them by nearly half? Our argument is that the Court didn't appreciate its discretion to appreciate on a particular ground under Kimbrough that it had a policy, the discretion to depart based on policy. Didn't the Court note that the evaluations of the guidelines should be done on a national level, not just each judge on an ad hoc basis? Yes, and that's part of the ---- Well, that doesn't seem to say she didn't know she could depart. She just said, I know I can, but I'm not going to because it should be done on a national basis. Your Honor, we'd respectfully submit that her statement was not that clear, that it's not possible to ---- I read it, and I thought to myself, every time I've ever said that, it was, well, this ought to be a national level, not me deciding what I ought to do. I know I could do it, but I think I better let the national boys take care of it. And if that's what the Court had said, that would be a different story. Well, that's exactly what she said. The evaluations of the guidelines, and I quote, should be done on a national level, not just each judge on an ad hoc basis. But the question is whether she understood that she could do that if she wanted to, rather than ---- Well, it also, she said, ecstasy is generally marketed to younger people, and therefore the drug was more serious than others. That doesn't seem to me to suggest she doesn't know she can do something. It just means to me, well, this is a younger people thing, and I don't think I'm going to break it apart. And again, Your Honor, from the record, it's not clear whether she ---- It isn't clear? Well, it's clear that she ---- I read it, and I couldn't come up with another conclusion. Your Honor, we submit that it's not clear whether she would have necessarily found that, and based her ruling on that, independently. All right. And I understand your argument. Thank you, Your Honor. Very good. So the rest of the time, we'll give you an extra minute on top of that. Hugely generous, okay? Thank you, Your Honor. Okay. Government, please. Good morning, Your Honors. My name is Roger Rogoff. I represent the United States. May it please the Court. On March 29, 2010, Judge Richard Jones authorized a wiretap based on the affidavit of Officer John Ditto. That affidavit was 49 pages long. Help me with something. Sure. It's obvious to anybody who's handled these cases that the affidavits are often so long they're hard to read, and it's often cut-and-paste word processing documents that have 49 pages of boilerplate. We've commented on that in our decisions. The evil that is supposed to be avoided by this whole process is a wiretap based on the contention, we think these guys are dirty, we can't prove it, so we'd like a wiretap in the hopes that we'll get some evidence that supports our belief that they're dirty. And, of course, you don't get appeals from the ones where the wiretap doesn't pan out and they get nothing. Sure. So a whole lot of people's privacy can be invaded, including whatever people call them on the phone on unrelated matters, just on the speculation that they may be dirty. What do you have here in particular that shows the wiretap was justified under the statute? Certainly, Your Honor, and I'm going to go through. Forty-nine pages to me cuts against as much as it cuts for. And I guess that would be true if all that was in there was a wiretap. I mean, I think practically to the magistrate, you're imposing such a burden on the magistrate to read through all the boilerplate and find the good stuff. Except that the court requires us to tell the court why we didn't try to. I know that. I know that. There's nothing wrong with the 49 pages, but the fact that it's 49 pages does not make your case. I understand that, Your Honor. So what do you have here in particular other than the speculation that these guys are dirty? Well, in eight different paragraphs in the affidavit, the officer discussed the physical surveillance that was specifically done of both EMA and EM. In five different paragraphs in the affidavit, they specifically discussed the video surveillance and electronic surveillance, meaning using video cameras, that they did of both EMA and EM. In about five different paragraphs, they discussed GPS phone tracking that they did and also GPS car tracking that they did of both of these subjects. They conducted database checks. Okay. And what did the surveillance prove? Nothing, as I recall. Well, it proved that they went down to California in an effort to – I think the one thing that struck me that you had in the surveillance was surveillance evading driving, such as running a red light or making an unnecessary turn. That made it look like these guys are real wary of somebody on their tail and the guilty flee where no man pursueth. Well, there were four instances where counter-surveillance was done – yeah, counter-surveillance was done in a car. In other words, they tried to get away. One was at Daniels Broiler here in Seattle where they ran a red light. Another one – another two were done down in Phoenix, Arizona, and a fourth one was discussed as well in the affidavit. So it was not just one instance. It was something that happened on a regular basis with this group of people. In addition – Okay, so what you've got there is the fancy electronic version of when our police car slowly went down the street, this kid looked at us and started running. That's true. And then you had the sophistication of the organization in general, which overlays all that. I mean, if you think about what happened here, you have these guys from Seattle who come down to Arizona, stop in California, sort of set up a base in California, and then travel back and forth to Phoenix in order to try and buy 80 to 100 kilograms of cocaine. How did you know that they were traveling back and forth to buy the 80 kilos before the surveillance? Well, one of the things they did was they got flight records, and that's one of the pieces of the investigation. They flew, but frankly, I suspect that half the people in this room flew. Certainly. But they didn't fly and then meet with known drug dealers. I doubt half the people in this room did that. Maybe, though. And – I don't know. There's a felon that I nod good morning to every morning. He just lost the jury. You Honor, I agree that these are pieces of the puzzle that they were putting together, and one of them were the flight records and then the surveillance of these people flying from Seattle down to California and then driving out to Phoenix in order to meet known drug dealers. Then you have the use. How do you know that it was in order to meet known drug dealers? Well, we had confidential sources, sources A and B, which were discussed. Okay. Now we're getting somewhere. So they met with somebody, and a source said they were meeting with a drug dealer. That's correct. And the source said that they were negotiating to buy 80 to 100 kilograms of cocaine and that they had bought 30 and 40-kilogram loads on two prior occasions and that they could try to introduce an undercover officer to these people in order to try and conduct a reverse buy. That was the plan initially down in Phoenix. It didn't work. Reverse buy? That means you sell them some dope and try to buy it from them, right? That's right. Correct. And they tried that, and it didn't work because Yim and Ima decided that they didn't want the dope, the cocaine, until they saw the money, and they couldn't do that as part of the operation. Did they get that far with the attempt to sell the dope to them? No, because Ima and Yim pulled out of dealing with the drug dealers, Cordova. I'm thinking if somebody tried to sell dope to me, I would not buy dope from them, but it is in evidence that I'm a sophisticated drug dealer. Well, they knew that Ima and Yim wanted to test the cocaine, so they talked about using tubes or testing kits in order to make sure that it had high enough heat, as they called it, or that it was pure enough. And when they weren't able to make that happen, the negotiations broke down. Ima and Yim stopped dealing with this group of drug dealers in Phoenix, and that was actually one of the problems that the officers had in trying to investigate this group, is that the tentacle of the cell that went out to Phoenix was cut off because Ima and Yim wouldn't deal with them anymore. So now they're stuck trying to figure out who they're dealing with. I can't go backwards from what we know later to what was known at the time, so I have to look at what knowledge there was at the time. The best tidbit here was what the source told you at the time. That's right, and the source told them that they were no longer dealing with, quote, the Chinese. That was the information they had, and so they were stuck. But how do I know that the reason they weren't dealing with the Chinese was if there's somebody that I say hello to every morning and then I discover he's some kind of criminal trying to involve me in a scheme, I quit saying hello to him in the morning? Well, I think that in that case you need to look at all of the factors that went into this investigation. I mean, you don't just have some guy walking down the street and saying hello to a drug dealer. You have a group of people who were coming down from Seattle for a short period of time and going back. You have people who were meeting. Like a deposition trip. Right, that's correct, a deposition trip. I had a deposition trip to Las Vegas when I was in practice, and I wouldn't be surprised if around that blackjack table there weren't some bad guys. I don't know anything about them. Didn't at the time. Except that you didn't have a confidential source. Didn't care. He wanted their money. That's all he wanted. It was a short trip, and then I went back. So that's not giving me anything. Sure, except that you didn't have a confidential source who was sitting at the table with you who later told the police that you were talking to these drug dealers, these people about buying drugs from them. That's something. That's important. Can we just cut to the chase following up on what Judge Kleinfeld said? The reality is we can't work backwards based upon what the wiretaps showed. You mentioned the information that the confidential informant gave you in Phoenix. What other specific incidences can you refer us to in the affidavit that were known prior to the wiretap authorization that would help us better understand the necessity? I know there's a lot of information here, but we need to look at the specifics. You've given us the one. What are your other best incidents that show necessity? Well, you have the canine sniff of the storage locker in the Seattle area. That came up positive, and the agents made the decision that they didn't want to go into the storage locker because canine sniffs can come up positive sometimes for dope that had been there and wasn't there at the time, and so they were concerned that that would be futile. Okay, what else? They also had the undercover officer in Phoenix who met with these drug dealers. This is for the same thing we were talking about before, right? In Phoenix, that's correct. All right, what else? You have the tolls and subscriber information that they received and then the pen register that went on for 60 days. That pen register connected EMA and YIM to a number of different known drug dealers, all of which are outlined in the affidavit by Officer Ditto, and these are people who were active at the time and active in other investigations. You then have, of course, the counter surveillance that we've talked about already. You have the fact that, well, I think those are the main points that establish probable cause for what they were doing. With regard to necessity, they tried a number of other things, Your Honor. For instance, they looked at property records of all of their homes. They got a poll cam up on EMA's residence. They tried to get a poll cam up on YIM's residence. I think we need to focus a little bit more on the necessity for a wiretap, as Judge Kleinfeld pointed out. There are a lot of people in this audience, maybe even the judges. You know, if you take isolated instances, you happen to be in a certain place at a certain time, you can draw inferences that may have absolutely nothing to do with the truth. You basically, under the statute, need to show that you've tried all the things that would otherwise yield more evidence. This is pretty sparse, and that you need to have a wiretap. Is what you've told us the sum and substance of what the government had? Well, you also have, I mean, to some extent, although with necessity, you're talking, we're doing two different things, probable cause and necessity. As far as probable cause, I think that the information is pretty sparse. And I think right now we're focused on necessity. And with regard to necessity, what they tried and either didn't work or didn't think that they could use was outlined in that affidavit, and those are the things that we're talking about. A lot of them weren't fruitful, Your Honor. A lot of them didn't lead to anything, and that was the problem. The problem is that there was no way to get into this group. They didn't have a confidential source after Phoenix that they could insert into this group. They didn't have an undercover that they could easily insert into this group. They knew that this group was incredibly sophisticated based on the way that they were coming down to buy these drugs, based on what they were asking the sellers to do as far as testing the drugs and so forth. And as far as the amount that they were buying, and there's a list of, you know, 10 or 11 other things that the judge, the magistrate judge, the issuing judge, could have looked at to determine this is a sophisticated group of people. Your opposing counsel suggests that we should only, and indeed that the magistrate judge or the district judge should only have looked at pockets like Seattle but not tie the nationwide aspects of this scheme together. What's your response to that? Well, it doesn't make any sense. The question that the court asked, the question that the courts of appeal have asked is what traditional law enforcement techniques were tried specific to the people whose phones you're trying to tap. And that's the information that Officer Ditto provided. The courts don't say you can only use information that occurred in a particular place or at a particular time. They ask you to focus on the targets and the target phones that are involved. And that's exactly what Officer Ditto did here. They focused on EMA and YIM and all of the information that relates to necessity in this case relates to EMA and YIM. And that information began to come in November of 2009, and therefore it was a much longer investigation. Who did it doesn't matter. I mean, if we were standing here and we were talking about discovery today, I'm pretty sure that the information that was gathered in Phoenix and in California and everywhere else would certainly be part of the same investigation and the government would be required to provide that discovery. It shouldn't be any different. I'm not really troubled by the idea that we should look outside Seattle as well as inside Seattle. If it's a widespread multi-state or international conspiracy, looking elsewhere seems fine to me. My focus is still on facts and circumstances that justify a belief that a particular offense has been or is being or is about to be committed, since all of these other techniques would be futile on somebody who is totally innocent. And you can't get a wiretap because you think somebody's dirty. You have no evidence that an offense has been or is about to be committed. You've tried other things and you've struck out. You've gotten no evidence that these people are committing any crime. And now you'd like to wiretap them just so you can feel like you've confirmed it. But that's not what happened here. I mean, they knew that these people were involved. It sounds like I'm trying to make a list for myself of what you had beyond that. And what you have is I think you have a snitch who says they deal dope. Two snitches. Two snitches say they steal dope. And you have contacts between them and other dealers. That's correct. On the phone. You also have. Anything else I should put on my list? Sure. Put on the list the financial investigation that had occurred, which revealed. And what did it show? It revealed a number of cash deposits and cash withdrawals by members of this organization. How big? People connected. Your Honor, they are listed in paragraphs. CTRs? What's that? CTRs? Yes, CTRs. So they were big? Yes, over $10,000. Okay, big deposits of cash. That's right. You have people with no evidence of legitimate employment. They're out in California and Phoenix for, you know, in the middle of the week for a significant number of days. There's no evidence from either of them that they had jobs that would make the kind of money that are referenced in the financial investigation part of the affidavit. Okay, now we're getting somewhere. So you have evidence they're spending a lot of money and no legitimate means of making it in huge deposits. That's correct. Combined with the information that they've already talked about and the undercover officer. And contacts with dealers. And the. Anything else I should put on this list? And the, well, no, no. Okay. But, I mean, I, you know, while I understand, Your Honor, making the list and I understand. I don't want you wiretapping a bunch of people who didn't do anything just because you can't find out, find any evidence that they did do anything bad. But I think that the nature of the information from the two sources is important here. And you can't just say there was information from two sources. There was significant information from those two people, and it was information that referenced deals that had occurred before that were completed and then a deal that they were trying to have. It's not just me. I think Congress doesn't want you wiretapping people who didn't do anything just because you can't get evidence that they're dirty. If I might, Counsel, I'm going to try to muscle in here. My presiding judge and my good senior judge have pretty well taken a little shot at you. But I want you to step back. It seems to me there's two issues I'm really looking at here. There is an issue about whether the application itself complies with the statute, which is one issue. And then there's an issue which is the necessity thereafter. Now, my worry is that when I read Yim's and Camacho's counsel's arguments, they all say that they're not challenging necessity, that instead they're challenging the statute itself or the compliance with the statute. In fact, when they talk about their boilerplate language and are not specific to the Ima Yim investigation, they cite Gonzales. But that's a necessity determination in Gonzales. It had nothing to do with the first. I read what they say. I mean, they say every time, we're not challenging the necessity issue, so we're determining whether it complies with the statute. If they're not challenging the necessity issue, why is it we're arguing about it? Well, I think they will tell you that they are arguing the necessity issue, not to make their point for them. But I think that Your Honor brings up a point that is actually really confusing when you look at the case law in this area. And that is what it means, what that first question means, the full and complete statement, what that procedural question means, and then what does that mean in regards to necessity. I don't think it's ever really explained. You have these cases that say the standard of review for whether there's a full and complete statement of the case is de novo. And then the standard of review as to whether necessity exists is abuse of discretion. But then the cases sort of merge the two, and it becomes very murky, and it's hard to understand exactly what the courts are looking for with regard to the first question and what they're looking for with regard to the second question. As I look at it, what makes the most sense is that the first one is really a procedural matter. Does the affidavit set out all of the statutory requirements? Are they there? Is there a section that talks about traditional law enforcement techniques? Are a number of those law enforcement techniques listed? Is there a section that talks about the Department of Justice authorizing the wiretap? All of those procedural issues need to be there. And as I understand it, really looking at what we have here, there's no challenge to the fact that they're all procedurally there. That's correct. And so really the question that is an abuse of discretion standard and is for the district judge really to delve into the facts and the law is whether that necessity actually existed, whether these people needed to do the wiretap. And upon that particular issue, I'm not supposed to just delve into it to my own degree and however I want to do it, but I have to give some discretion to the magistrate who makes the first decision. That's correct. And in this case, it's not like the magistrate didn't do a significant job on that. You have two 15-page decisions where she went into each to all of the facts in this case, all of the circumstances. She talked about the credibility of the information that was presented to the magistrate, and she made a specific decision that there was necessity based on everything that she'd heard. Thank you. All right. I just wanted your input into that. No, I don't. Judge Kleinfeld, any more questions? Thank you, the government. So let's see. Let's just really go overboard and give her three full minutes. Okay. There you go. Thank you very much. I appreciate it. Hopefully I'll be able to get to more than one point in my three minutes, but if I don't, the one point that I want to address is the question from Judge Kleinfeld about good faith. Good faith has not been briefed in this case. The government mentioned it in their table of contents, but they didn't brief it. You mean applicability of Leon. That's correct. And so that's why it's not been briefed. So I would urge the Court first, if we're going to have a decision that takes that into account, that we get an opportunity to brief it. But I will say here that this is a very different situation than the situation under the Fourth Amendment where good faith applies. Under the Fourth Amendment, suppression is a judicially crafted remedy. Because we have a judicially crafted remedy there, it makes sense that we would have a judicially crafted exception to that remedy. This is very different. Here we have a whole statutory scheme that says these are the rules for wiretapping, and if you don't follow these rules, the remedy is suppression. 18 U.S.C. 2515 is very, very clear about that. That's very helpful. Thanks. And there are a few cases, though none that I know of from the Ninth Circuit, that address this issue directly. Most of them are from the Second Circuit. The leading case is a case called, I think it's called Spadaccino. It's S-P-A-D-A-C-C-I-N-O. And that case says essentially what I just said, that we're talking about a judicially crafted exception, and you can't judicially craft an exception to a statute. And there are other cases who have come to similar conclusions having to do with there's no impeachment exception, for example, as there would be under the Fourth Amendment, no perjury exception either. Thanks. When we're talking about making lists and looking at what there was in this case, I think that we need to be very clear to distinguish, make the distinction that the government has talked about, this distinction between was there a full and complete statement, and if so, did that statement add up to necessity? My questions go to 2518B1. That's why I was asking for that list. Correct. I understand that. And we would submit that it's more than the government says, well, if you're considering whether or not it's a fair and complete statement, you just look and you take down the list and you say, well, did they mention search warrants? Yes. Did they mention grand jurisdiction? We're talking about 1C? We're talking about, yeah, 1C. Was there a full and complete statement? And that's the area where everyone agrees that the standard of review is de novo. We would submit that it's not like the government says. It's not just a matter of going through and mentioning all the right points. Well, but just a minute, what's your best case otherwise? What's my best case otherwise? You're not going to cite me, Gonzales, because Gonzales goes to necessity. Well, Gonzales talks about necessity, but it also talks about the fact that boilerplate doesn't matter in any of these determinations. That says boilerplate conclusions that are merely describe inherent limitations of normal investigative procedures are insufficient to establish necessity. I'm reading exactly from the case. Well, the case also says that such statements do not reasonably explain why traditional investigative tools are unlikely to succeed, and that's what the statute says a full and complete statement is to be. I'll be fair. I, again, think you're talking about necessity. Well, and I do want to point out, for Mr. Keller's benefit, that he did raise that issue. He is making a different argument than Mr. Yim is making. Well, as I read what Camacho-Contreras raises, he raises the issue of full and complete in his brief, and that is that Camacho-Contreras blew brief at four. Then there's no argument about it at four. So then, again, I'm, again, having a tough time. I'm worried that you've waived your argument about necessity. Mr. Yim's briefing addresses, was there a full and complete statement? And that's all that we've addressed. Okay. Your time has expired, and we thank you all for your argument, ably done. We thank you, and the case just argued is submitted.
judges: Kleinfeld, Smith, Smith